**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
|     HOLLY ANN WOODWORTH | ) | Case No. 11-11051-BFK |
| | ) | Chapter 7 |
|         Debtor | ) | |
| | ) | |
| JANET MEIBURGER, TRUSTEE | ) | |
| | ) | |
|         Plaintiff | ) | |
| vs. | ) | Adversary Proceeding No. 11-01636 |
| | ) | |
| LNDP&G ULTRA TRUST, *et al.* | ) | |
| | ) | |
|         Defendants | ) | |

**AMENDED[1] MEMORANDUM OPINION**

There is a popular perception among many elderly Americans that, in order to qualify for Medicaid and other public benefits, they should move assets out of their own names and into the names of their children. There are three serious problems inherent in such an asset transfer strategy. First, the federal statute governing Medicaid eligibility provides for a "look back" period of 60 months for transfers occurring after February 8, 2006, for persons who have transferred their assets for less than fair market value (there is an exception for special needs trusts in subsection (d) of the statute, that is not relevant here). *See* 42 U.S.C. § 1396p(c)-(d). Second, creditors of the transferor (the parent) might claim that the transfer was fraudulent, in derogation of their rights. Third, the creditors of the transferee (the son or the daughter) might claim that the assets have been irrevocably transferred by the parent, and are now available to satisfy their claims. Sadly, it is this last eventuality that has come to pass in this case.

---

[1] This Amended Memorandum Opinion changes only the third sentence of the first paragraph.

Janet Meiburger, the Chapter 7 bankruptcy trustee of the bankruptcy estate of Holly Ann Woodworth, seeks to recover $142,742.00 in funds that were transferred years ago by Ms. Woodworth's mother, Dorothy Lee Stutesman, to a Merrill Lynch account in the name of her daughter.  Ms. Woodworth later transferred the funds to the LNDP&G Ultra Trust (hereinafter, "the Trust" or "the Ultra Trust").  The Trustee maintains that the Debtor's transfer of the funds to the Ultra Trust is avoidable under Sections 548(a)(1)(A) and 548(a)(1)(B) of the Bankruptcy Code, and that the value of the transfer may be recovered under Section 550(a) of the Bankruptcy Code.  11 U.S.C. §§ 548(a)(1)(A)-(B), 550(a).  The sole defense asserted by the Trust is that the Debtor held bare legal title to the funds and the funds were subject to an express trust for the benefit of her mother.  Therefore, the Defendants assert the property was not property of the Debtor's estate at the time of the transfer.  The Court finds that both legal and equitable title to the funds resided with the Debtor at the time of the transfer to the Ultra Trust.  Accordingly, the Court will enter judgment for the Trustee.[2]

**Findings of Fact**

The Court held a trial on the merits in this matter on January 18, 2013.  Having heard the testimony of the witnesses, and having reviewed the evidence, the Court makes the following findings of fact:

1.      Dorothy Lee Stutesman is the Debtor's mother.  Ms. Stutesman lives in Cottonwood, Arizona.  She is 71, but continues to work as a nursing assistant in an assisted living facility in Arizona, where she works for an hourly wage.

---

[2]  There are two Defendants in this adversary proceeding, the LNDP&G Ultra Trust and Kenneth Claiborne Murrell, Trustee of the LNDP&G Ultra Trust.  Their interests in the subject matter of the litigation are indistinguishable.  In essence, they are the same Defendant.  References to the Trust throughout this Opinion shall be deemed to include Mr. Murrell as Trustee.

2. In 2002, Ms. Stutesman and her husband sold their pharmacy business to Safeway, Inc. Def. Ex. T. Although the initial purchase price was only $28,000, there was an earn-out provision, under which Safeway would pay additional consideration for prescriptions filled over a certain agreed-upon volume, for a stated period of time. Def. Ex. T, § 3.1. The consideration for the purchase ultimately turned out to be approximately $200,000.00.

3. Ms. Stutesman's husband passed away on October 25, 2002.

4. By her own account, Ms. Stutesman is not financially sophisticated. Over the years, she has relied on her husband and her daughter, Ms. Woodworth, for advice on how to manage her financial affairs.

### The Transfer of the Funds to the Merrill Lynch Account

5. After Ms. Stutesman's husband passed away, she came to Virginia to visit with her daughter during Christmas 2002. Ms. Woodworth set up an appointment with a representative of Merrill Lynch to discuss investing the funds.

6. Ultimately, the funds were invested at Merrill Lynch. The account was set up in Ms. Woodworth's name only as the Account Owner, using Ms. Woodworth's social security number. Merrill Lynch Client Relationship Agreement, Def. Ex. H. Ms. Woodworth, as Account Owner, also entered into a Transfer on Death Agreement, under which Ms. Stutesman was identified as the 99% beneficiary in the event of Ms. Woodworth's death. Def. Ex. H at pp. 1-4.

7. Paragraph 6 of the Transfer on Death Agreement provides:

> This Agreement revokes any prior agreement relating to the eligible funds, securities and assets held in the Account and may be revoked or changed by the Account Owner at any time prior to the Death of the Account Owner by executing a new Agreement or a written and notarized revocation of this Agreement, which shall be delivered to MLPF&S. It shall be the duty and responsibility of the Account Owner to notify MLPF&S of any

3

changes in the Beneficiaries, by death or otherwise.  Such notification shall be made by delivering a new TOD Agreement to MLPF&S.

8.      Although Ms. Stutesman was not a signatory to the Merrill Lynch account, she did have access to the funds, in the form of a debit card.  Def. Ex. U.  Tax statements were sent at the end of the year to Ms. Woodworth.  Ms. Woodworth paid the taxes on gains in the account.  In at least one instance, Ms. Woodworth was reimbursed from the account, for taxes that she paid that were attributable to the account.

9.      Ms. Stutesman was adamant in her testimony that she did not intend to make a gift of the funds to her daughter.  She testified that she wanted to protect the funds from "scammers," that is, persons who would seek to cheat her out of the money, and that she put the money in her daughter's name to protect it.  At the same time, Ms. Stutesman testified that it was her understanding that she could not have assets in her own name, in order to be eligible for Medicaid and other public benefits, should there come a time when she needed such benefits.

### The Transfer of the Funds to the LNDP&G Ultra Trust

10.     When the stock market crashed, and the Merrill Lynch account began to experience losses, Ms. Stutesman and Ms. Woodworth decided to leave Merrill Lynch.  Ms. Woodworth searched on the internet, using the search term "trusts and estates," for an alternative vehicle in which to hold the funds.  As a result of this search, she came into contact with Rocco Beatrice, of Estate Street Partners, in Boston.

11.     On March 12, 2010, Ms. Woodworth entered into an Engagement Letter with Estate Street Partners, LLC.  Pl. Ex. 3.  The Engagement Letter provided that Estate Street would provide Ms. Woodworth with a "complete and fully integrated Ultra Trust package for the protection of [her] assets, for the fixed fee of $18,828."  Pl. Ex. 3, ¶ I(A).  Under the "services to be provided" portion of the Engagement Letter, Estate Street agreed to provide "an Ultra Trust –

4

Financial Instrument for your Mother's home & vehicles." Pl. Ex. 3, ¶ I(A). The services further included "Financial Instrument for your brokerage." The Engagement Letter further provides (in bold, italic letters):

> ***Financial Instrument avoids creditor claims of fraudulent conveyance and civil conspiracy to divest yourself of valuable assets, and avoids IRS trigger for a taxable transaction.***

Pl. Ex. 3, ¶ I(A).

12. On April 19, 2010, the Law Offices of John F. Libertine sent the Ultra Trust and related documents to Ms. Stutesman, care of Ms. Woodworth. Pl. Ex. 5. Attached to Mr. Libertine's letter was a Summary of the LNDP&G Ultra Trust. The Summary states, in part: "For Asset Protection purposes, this Trust has been designed to reduce creditor risk, eliminate probate, and eliminate the estate tax." Pl. Ex. 5, p. 4.

13. Some time thereafter, Ms. Stutesman entered into the LNDP&G Ultra Trust. Pl. Ex. 11. Ms. Woodworth and Ms. Stutesman both executed a document entitled Private Agreement Exercisable on Demand by Holly Ann Woodworth. Pl. Ex. 12. Ms. Woodworth also entered into a Financial Instrument Private Annuity Agreement. Pl. Ex. 13. Finally, Ms. Stutesman executed a document known as the Roadmap, containing a chart that purports to summarize the foregoing documents.[3] Pl. Ex. 14. Ms. Stutesman also executed and recorded a Warranty Deed transferring her home to the LNDP&G Ultra Trust. Pl. Ex. 24.[4]

14. On April 28, 2010, Ms. Woodworth transferred the sum of $142,742.00 from the Merrill Lynch account to the LNDP&G Trust. Pl. Exs. 18, 19.

---

[3] The LNDP&G Ultra Trust, the Private Agreement and the Roadmap are dated "as of April 2, 2010," a date that precedes Mr. Libertine's letter forwarding the documents. The Financial Instrument Private Annuity is dated as of July 26, 2010.

[4] The bankruptcy Trustee does not maintain that the Debtor had any legal interest in the home, and is not seeking to avoid the transfer of the home to the Ultra Trust.

5

15. Ms. Stutesman testified that she did not view the LNDP&G Trust as an investment. Having suffered losses in the Merrill Lynch account, she had a strong desire to protect the funds, rather than to seek growth as an investment. She further testified that, in her view, it was her money until she died, and that in any event, her daughter, Ms. Woodworth, could not access the money until she reached the age of 75.

16. Ms. Woodworth's testimony was consistent with that of her mother. She testified that she always viewed the funds as her mother's money. She also testified that, under the Private Annuity Agreement, the Annuity would not be purchased until she, Ms. Woodworth, reached the age of 75.

### The Debtor's Bankruptcy Filing

17. Ms. Woodworth filed a voluntary petition under Chapter 7 in this Court on February 15, 2011. Bankr. Case No. 11-11051. The bankruptcy was precipitated by the fact that Ms. Woodworth had an investment property that was encumbered by a second mortgage loan that contained a balloon feature. The loan could not be refinanced because the property had lost value due to the general decline of real estate values.

18. Ms. Meiburger is the duly appointed Chapter 7 Trustee. She filed this adversary proceeding on November 23, 2011.

### Conclusions of Law

**I.    Subject Matter Jurisdiction.**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and the Order of Reference of the U.S. District Court for the Eastern District of Virginia dated August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(H) (proceedings to

determine, avoid or recover fraudulent conveyances). Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409(a).

The Court finds that the Defendants have consented to the entry of final Orders by this Court. This adversary proceeding has been pending since November 23, 2011. The Defendants have filed an Answer (Docket No. 8), and three Amended Answers (Docket Nos. 41, 43, 63). The Defendants have not, throughout the course of the case, objected to the entry of final Orders by the Bankruptcy Court. The Defendants did not object to the entry of a final Order by the Bankruptcy Judge, at the trial. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986); *In re Bellingham Ins. Agency, Inc.*, __ F.3d __, 2012 WL 6013836 (9th Cir. 2012).[5]

## II.     The Merits of the Controversy.

### A. The Defendants Have Conceded the Plaintiff's Prima Facie Case.

The Defendants do not dispute that the transfer of the $142,742 to the LNDP&G Ultra Trust was a fraudulent transfer under Section 548(a)(1)(A) and (B) of the Bankruptcy Code. 11 U.S.C. § 548(a)(1)(A)–(B). In this, they are well advised. The Ultra Trust and related documents are vague, confusing, verbose and internally inconsistent.[6] They plainly were designed for the purpose of protecting assets from creditors. Pl. Exs. 3 ("Financial Instrument

---

[5] In the event that the Defendants appeal, and it is determined that the undersigned did not have the authority to enter a final judgment, then this Memorandum Opinion shall constitute the Court's proposed findings of fact and conclusions of law. *Shaia v. Taylor (In re Connelly)*, 476 B.R. 223, 235 (Bankr. E.D. Va. 2012). Should the Defendants take the position (for the first time) on appeal that the undersigned lacked authority to enter a final judgment, then they will be required to file Objections to the Court's proposed findings in accordance with Bankruptcy Rule 9033(b), in addition to filing a Notice of Appeal under Bankruptcy Rule 8002(a).

[6] As an example of an internal inconsistency, the Roadmap provides: "IF during the life of (1) Stutesman or After the Death of Stutesman and Beneficiaries does NOT include Holly Ann Woodworth [sic]: BY SPECIAL APPOINTMENT/ SEPARATE DOCUMENT Holly Ann Woodworth Has the Power to Appoint Herself as Beneficiary of this Trust, and Power of Appointment of New Beneficiaries, New Trustee and/or new Trust Protector." Pl. Ex. 14. The Private Agreement, on the other hand, provides: "notwithstanding any Article or Paragraph of the LNDP&G Ultra Trust Agreement with an effective date of April 2, 2010, Holly Ann Woodworth has the exclusive extraordinary right to appoint herself as a Beneficiary second only to Dorothy Lee Stutesman as Beneficiary within the written Agreement of the LNDP&G Ultra Trust." Pl. Ex. 12.

avoids creditor claims of fraudulent conveyance"), & 5 ("For Asset Protection purposes").  The Defendants properly concede that the Trustee has met her burden of putting on a *prima facie* case under Sections 548 and 550 of the Bankruptcy Code.  Rather, the Defendants argue that the property at issue, the $142,742, was never property of the Debtor's estate and always was held in trust for the Debtor's mother, Ms. Stutesman.

> *B.  The Defendants' Defense of an Express Trust is Not Supported by the Evidence.*

Section 548(a)(1) of the Bankruptcy Code provides that the Trustee may avoid a transfer "of an interest of the debtor in property."  Section 541(d) provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

If the Defendants are correct that Ms. Stutesman retained equitable title to the funds at the time of the transfer from the Merrill Lynch account to the Ultra Trust, then the Trustee's case should be dismissed.  If the Trustee is right, and the funds were property of the Debtor, then the Trustee wins.  *Begier v. IRS*, 496 U.S. 53, 58 (1990); *Tyler v. Old Republic Nat'l Title Ins. Co. (In re Dameron),* 155 F.3d 718 (4th Cir. 1998).

The Court looks to applicable non-bankruptcy law to determine the property rights and interests of the parties.  *Butner v. United States*, 440 U.S. 48, 55 (1979); *In re Dameron*, 155 F.3d at 722 ("Our consideration of what constitutes an 'equitable interest' subject to exclusion from the bankruptcy estate under § 541(d) is a question of state law.")  The parties agree that Virginia law is controlling here.

8

> With respect to the creation of an express trust, the Fourth Circuit has held:
>
> An express trust is created when the parties affirmatively manifest an intention that certain property be held in trust for the benefit of a third party. An express trust may be created without the use of technical words. All that is necessary are words, or circumstances, which unequivocally show an intention that the legal estate was vested in one person, to be held in some manner or for some purpose on behalf of another.

*In re Dameron*, 155 F.3d at 722 (citations and quotations omitted). Similarly:

> [U]nder Virginia law, an express trust is created when the parties affirmatively manifest an intention that certain property be held in trust for the benefit of a third party. *See Peal v. Luther*, 199 Va. 35, 97 S.E.2d 668, 669 (1957). If such a trust is created, the beneficiary of the trust "is equitable owner of the trust property. If the trustee transfers the trust property . . . , or if the trustee becomes insolvent, the beneficiary is still entitled to the property." *Broaddus v. Gresham*, 181 Va. 725, 26 S.E.2d 33, 35-36 (1943).

*Kubota Tractor Corp. v. Strack (In re Strack),* 524 F.3d 493, n.1 (4th Cir. 2008).

The fact that the funds were held in Ms. Woodworth's name as Account Owner in the Merrill Lynch account gives rise to a presumption that they are Ms. Woodworth's property. *In re Landamerica Fin. Grp.*, 2009 WL 1269578, at * 7 (Bankr. E.D. Va. 2009) ("money held in a bank account in the name of a debtor is presumed to be property of the bankruptcy estate"); *see also Amdura Nat'l Distribution Co. v. Amdura Corp. (In re Amdura Corp.*), 75 F.3d 1447, 1451 (10th Cir. 1996) ("We presume that deposits in a bank to the credit of a bankruptcy debtor belong to the entity in whose name the account is established"); *In re 1031 Tax Grp., LLC*, 439 B.R. 47, 70 (Bankr. S.D. N.Y. 2010).

Not only was Ms. Woodworth the Account Owner of the Merrill Lynch account, she had the right to revoke or change the Transfer on Death beneficiary, Ms. Stutesman, at any time, for any reason, simply by sending a written notice to Merrill Lynch. Transfer of Death Agreement, Def. Ex. H, p. 2. There was no evidence presented at the trial that there was *any* manifestation of

an intent to retain an equitable interest in the funds, at the time that they were deposited in the Merrill Lynch account, in 2002.[7]

Still, the Defendants argue, despite the lack of any contemporaneous evidence of an intent to retain an equitable interest in the funds on the part of Ms. Stutesman, the circumstances of the transfer would indicate that Ms. Stutesman intended to retain beneficial ownership of the property. *See In re Landamerica Fin. Grp.*, 2009 WL 1269578, at * 8 ("The affirmative intention to create a trust may be established by 'either express language to that effect or circumstances which show with reasonable certainty that a trust was intended to be created'" (quoting *Woods v. Stull*, 182 Va. 888, 902 (1944); *Rivera v. Nedrich*, 259 Va. 1, 6 (1999))). After all, they argue, why would a woman who was advancing in years, nearing retirement and working for an hourly wage, give the entirety of her retirement nest egg to her daughter? The answer lies in Ms. Stutesman's own testimony—she wanted to remove the funds from her own name and place them into the name of her daughter, in order to be eligible for Medicaid and other publicly available benefits, should the need arise. Ms. Stutesman can't have it both ways—she can't part with title for purposes of Medicaid eligibility, and at the same time claim that she retained an equitable title to the asset. To allow this kind of secret reservation of equitable title would be to sanction Medicaid fraud.

Moreover, the nature of the Private Annuity compels the conclusion that the funds are those of Ms. Woodworth. If, as asserted by the Defendants, the funds were held in trust for Ms. Stutesman, then Ms. Woodworth would have had fiduciary duties to her mother, for the preservation and prudent investment of the funds for her mother's benefit. *See* Va. Code §§

---

[7] Later, when the discussions with Estate Street Partners began, Estate Street's Engagement Letter stated that they would provide an Ultra Trust "for [Ms. Woodworth's] brokerage," i.e., for the funds in the Merrill Lynch account and "for [Ms. Stutesman's] home and vehicles." Pl. Ex. 3.

10

64.2-763 (Duty to Administer Trust and Invest), 64.2-764 (Duty of Loyalty), 64.2-765 (Impartiality), and 64.2-766 (Prudent Administration). Yet, Ms. Woodworth spent the entire corpus of this supposed trust, $147,742, to purchase an annuity for her own benefit. *See* Financial Instrument Private Annuity Agreement, Def. Ex. D. Ms. Woodworth testified that the annuity would be purchased only when her mother passed away, but this is not what the Private Annuity Agreement says. It provided that the Consideration ($142,742) was to be paid "no later than September 15, 2011 (the 'Consideration Payment Date')." Pl. Ex. 13, ¶ 1.1(b). The fact that the Annuity is for Ms. Woodworth's sole benefit, and not that of her mother, leads the Court to conclude that Ms. Woodworth owned the beneficial interest in the funds at the time of the transfer to the Ultra Trust.[8]

In this regard, the bankruptcy Trustee correctly points out that, notwithstanding the fact that the Trustee of the Ultra Trust has unfettered discretion to make payments out of the trust assets to the beneficiaries, the LNDP&G Ultra Trust provides:

> Notwithstanding the foregoing, the Trustee is directed not to make any distribution of principal or income of the Trust if such distribution will impair the ability of the Trustee to satisfy any obligation of the Trust, *including but not limited to any private annuity or installment sale obligation of the Trust*.

Pl. Ex. 11, Art. II, § I(7) (emphasis added). By its terms, then, the Trust's obligations under the Private Annuity Agreement (i.e., its obligations to Ms. Woodworth) have priority over any discretionary distributions to the Beneficiaries of the Trust.

---

[8] The structure of the Annuity also reinforces the conclusion that the transfer to the Ultra Trust was a fraudulent transfer, as conceded by the Defendants. The Financial Instrument Private Annuity Agreement provides that the entire Consideration, $142,742, was payable on September 15, 2011 (the "Consideration Payment Date"). Pl. Ex. 13, ¶ 1.1(b). At the same time, the Agreement provides that "the value of the Annuity is intended to equal the value of the Consideration." Pl. Ex. 13, ¶ 2.4(c). It is impossible for the Court to believe that Ms. Woodworth would pay $142,742 at the age of 45, for an Annuity that will pay precisely the same amount thirty years later, when she reaches the age of 75.

Finally, both Ms. Stutesman and Ms. Woodworth testified that the Trust's assets were to be used as a retirement fund for Ms. Stutesman and that Ms. Woodworth would only receive the remainder of the funds, if any, after her mother passed away. This, again, is an incorrect reading of the Trust. Article II, Section A of the Trust provides as follows:

> Distributions are only to "Living Beneficiaries" subject to however, the Trust Protector's veto power over any distributions under Article V of this Trust Agreement. Trust distributions to "Living Beneficiaries" in equal shares, namely: [the names of three grandchildren are inserted here - *not* Ms. Stutesman] may be used First (1st) for education, Second (2nd) as downpayment and closing costs towards the purchase of a primary residence prior to attaining age thirty five (35) then to the full and exclusive discretion of the Trustee subject to however, the Trust Protector's veto power over any distributions under Article V of this Trust Agreement.

Pl. Ex. 11, Article II(A).

In this regard, the testimony of both Ms. Stutesman and Ms. Woodward, that the funds were to be used for Ms. Stutesman's retirement, is not consistent with the terms of the Trust itself. This is not to say that they weren't being truthful with the Court; this simply indicates that their common understanding of Ms. Stutesman's interest in the trust assets was not consistent with the terms of the Trust.

In sum, the Court finds that the Debtor had complete ownership and control of the funds at the time that they were transferred to the Ultra Trust and that Ms. Stutesman retained no beneficial interest in the funds after their transfer to the Merrill Lynch account.

## Conclusion

For the foregoing reasons, the Court will enter judgment in favor of the Plaintiff in the amount of $142,742, against the LNDP&G Ultra Trust and Mr. Murrell in his capacity as Trustee of the LNDP&G Ultra Trust (and not individually).

      A separate Order shall issue.


Date: _____                 _____
                                                               Brian F. Kenney
                                                               United States Bankruptcy Judge


Copies to:

Janet M. Meiburger, Esquire
The Meiburger Law Firm, P.C.
1493 Chain Bridge Road, Suite 201
McLean, VA 22101-5726
Counsel for the Plaintiff

Robert D. Wittenauer, Esquire
9329 Battle Street
Manassas, VA 20110
Counsel for the Defendants

Gregory M. Wade, Esquire
Wade, Friedman & Sutter, P.C.
616 N. Washington Street
Alexandria, VA 22314-1991
Counsel for the Defendants

John W. Bevis, Esquire
John W. Bevis, P.C.
10521 Judicial Drive, Suite #204
Fairfax, VA 22030
Counsel to the Debtor